[No. B106304. Second Dist., Div. Three. Sept. 1, 1998.]

DOWNEY VENTURE et al., Plaintiffs and Appellants, v.
LMI INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Shapiro, Hinds & Mitchell, Carl W. Shapiro, Keith A. Meyer and Cindy F. Forman for Plaintiffs and Appellants.

Shernoff, Bidart, Darras & Arkin, William M. Shernoff, Sharon J. Arkin, Anderson, Kill & Olick, Jordan S. Stanzler, Deborah M. Mongan, Jordan S. Stanzler, John A. MacDonald, Troop, Meisinger, Steuber & Pasich,

Kirk A. Pasich, Lori M. Yankelevits, Irell & Manella and Thomas W. Johnson Jr., as Amici Curiae on behalf of Plaintiffs and Appellants.

Selman & Breitman, Alan B. Yuter and Lisa H. Kahn for Defendant and Appellant.

Musick, Peeler & Garrett, R. Joseph De Briyn, Harry W. R. Chamberlain II, Mary Catherine M. Bohen, Cheryl A. Orr, Barger & Wolen, Richard De Saint Phalle, Ethan A. Miller, Haight, Brown & Bonesteel, Roy G. Weatherup, John W. Sheller, Michael J. Leahy, Horvitz & Levy, Barry R. Levy, Mitchell C. Tilner, Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Hancock, Rothert & Bunshoft and Deborah A. Pitts as Amici Curiae on behalf of Defendant and Appellant.

William W. Palmer, Farmer & Murphy and George E. Murphy as Amici Curiae upon the request of the Court of Appeal.

## OPINION

**CROSKEY, J.**—The principal question presented by this case is whether insurance liability coverage for a claim of malicious prosecution, even though expressly promised in the policy, is precluded by the provisions of Insurance Code section 533 which bars indemnity for "wilful acts" of an insured.[1]

Plaintiffs, appellants and cross-respondents, Richard Posell (Posell), Mitchell Shapiro and Ruth Shapiro (Shapiro) and The Downey Venture, a limited partnership (Downey) (collectively, the Downey plaintiffs), seek reversal of a declaratory judgment determining that section 533 bars indemnity for a claim for malicious prosecution which had been asserted against

---

[1] Insurance Code section 533 (hereinafter section 533) provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

The parties also raised the application of Civil Code section 1668 (hereinafter section 1668) which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." While there are some differences in their application, these two statutes do embody the same public policy with respect to "wilful" acts. However, it is not at all clear that section 1668 applies to indemnity agreements such as an insurance policy. (See *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1741 [286 Cal.Rptr. 435].) Moreover, since section 533 clearly precludes an insurer from indemnifying an insured for liability arising from the wilful injury to the person or property of another, there would be no reason for us to discuss or consider section 1668 even if it did apply. Therefore, throughout this opinion (except for our recitations of trial court rulings) we will focus our discussion solely on section 533.

the Downey plaintiffs in the underlying action. Defendant, respondent and cross-appellant, LMI Insurance Company (LMI), had issued to Downey a comprehensive general liability policy[2] which expressly promised coverage for a claim of malicious prosecution.[3] LMI cross appeals from the trial court's determination that its claim for reimbursement of funds advanced to settle the underlying action may be reduced by an amount found to be allocable to defense costs which LMI "saved" by entering into the settlement.

We conclude that the public policy precluding indemnification coverage for "wilful acts," as expressed in section 533, bars indemnification for any malicious prosecution claim for which an insured is personally liable in California, even though such coverage was expressly promised in the policy; however, such public policy does not preclude a defense and an insurer promising coverage for malicious prosecution is nonetheless liable to provide a defense to such a claim. We therefore affirm the judgment declaring that indemnity is precluded, but we reverse the trial court's order which limited LMI's right to recoup amounts paid to settle claims against the Downey plaintiffs. Any such reduction of the reimbursement right would have the practical consequence of providing a proscribed indemnity benefit and an improper increase in LMI's defense burden.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1992, Downey filed suit against Elizabeth O'Grady and Timothy Watson, as trustees of a trust which was the owner and lessor of a shopping center in which Downey was a lessee. Posell and Shapiro were Downey's

---

[2]As general partners of Downey, Posell and Shapiro were also included as insured parties under the LMI policy issued to the partnership.

[3]The relevant portions of Downey's policy provided:

"COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

"1. Insuring Agreement.

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS—COVERAGES A AND B. We will have the right and duty to defend any 'suit' seeking those damages. . . . [¶] . . . 'Personal Injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

"1. False arrest, detention or imprisonment;

"2. *Malicious prosecution;*

"3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

"4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

"5. Oral or written publication of material that violates a person's right of privacy." (Italics added.)

attorneys of record in that suit and were also its general partners. The litigation arose out of a dispute between Downey and said trustees with respect to the terms of the lease.[4] Downey alleged causes of action for (1) breach of contract, (2) intentional and negligent interference with contract and interference with prospective economic advantage and (3) civil RICO (Racketeer Influenced and Corrupt Oranizations Act) violations.

On October 15, 1992, a summary judgment was entered against Downey and in favor of the trustees.[5] On December 10, 1992, O'Grady filed suit against the Downey plaintiffs on claims for breach of contract, declaratory relief, abuse of process and malicious prosecution. The Downey plaintiffs filed an answer denying that they had liability on any of the alleged claims. Defense of the action was tendered to LMI.

On March 12, 1993, LMI wrote to Shapiro advising that there was coverage under the "personal injury" provisions of Downey's policy for the malicious prosecution claim, but not for the breach of contract, declaratory relief or abuse of process claims.[6] Nonetheless, LMI agreed to provide a full defense and expressly stated that "we are *not* reserving our rights in this case."[7] However, before LMI could assume the defense, Downey successfully demurred to the malicious prosecution cause of action on the ground that there was a pending appeal from the summary judgment granted in favor of O'Grady in the prior action. Thus, O'Grady could not truthfully allege a termination of the prior action in her favor.

---

[4]The lease involved had apparently been signed over 30 years before and provided for a relatively low rental. The litigation was initiated by Downey after O'Grady and Watson refused to consent to a proposed amendment to that lease sought by Downey which would have improved Downey's ability to obtain long-term financing for its business. However, it also appears that the requested change in the lease was one which the trust was not obligated to accept and which would not have been in its interest to grant.

[5]In granting summary judgment in favor of O'Grady and Watson, the trial court noted that there was no question, in light of the undisputed facts, that Downey's complaint was without merit. In addition to granting a summary judgment, the court also awarded sanctions against Downey's attorneys. The court's oral comments at the time it made such order included the following: "I think this is egregious that people who own or lease five acres of land for $2,500 per month because someone wrote them a sweet deal thirty years ago, and they are going to be able to take advantage of it for another twenty years, would have the nerve to sue someone because they won't allow them to change the conditions of the lease."

[6]Under settled law, the existence of a *potential* for coverage of one claim triggers a duty to defend, which duty necessarily includes a defense to the *entire* action even though that may include claims which are *not* potentially covered. (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 48 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 563 [91 Cal.Rptr. 153, 476 P.2d 825].)

[7]This statement was made in the context of advising Downey that the counsel it had hired to defend the action was not the responsibility of LMI; since LMI was not reserving any rights in the matter it would exercise its right to select counsel of its own choosing.

Once that appeal was resolved by an affirmance of the summary judgment, O'Grady amended her complaint to reallege the malicious prosecution claim. Defense of the action was then retendered to LMI. For reasons not made clear by the record, LMI requested a coverage opinion from its counsel before responding to this new tender. LMI claims that upon receipt of that opinion, it first became aware that section 533 precluded indemnification. Therefore, on April 12, 1994, it agreed to provide the Downey plaintiffs with a defense of the O'Grady complaint,[8] *but this time LMI fully reserved its rights* to dispute coverage and to seek reimbursement of any defense costs incurred or amounts paid by LMI on any settlement or judgment entered.[9]

Prior to the date that letter was sent, Watson (the other trustee of the trust) had filed (on February 9, 1994) his own action against the Downey plaintiffs, also alleging breach of contract, declaratory relief, abuse of process and malicious prosecution claims. This action was likewise tendered to LMI and the April 12 reservation of rights letter was expressly intended to apply to it as well.

Before the O'Grady and Watson actions came to trial, the trial court made two important rulings which affected both the nature and timing of the outcome of that litigation. Pursuant to Civil Code section 3295, subdivision (c), the trial court entered an order allowing pretrial discovery of Downey's financial condition.[10] In addition, the court granted O'Grady's motion *in limine* (based upon the factors articulated in *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498]) (*Sheldon Appel*) that the Downey plaintiffs had filed their action against O'Grady *without probable cause.*[11]

Within a week after these rulings, the O'Grady case settled. As a result of the rulings, the only issue which had remained to be litigated was the

---

[8]In light of a then recently filed federal case (*Lunsford* v. *American Guarantee & Liability Ins. Co.* (9th Cir. 1994) 18 F.3d 653) holding that "malicious prosecution" can encompass a claim for "abuse of process," LMI agreed to fund the defense of the O'Grady action from the date it was filed rather than from the date of the retender of the malicious prosecution claim.

[9]In his April 12, 1994, reservation of rights letter, LMI's counsel stated that the defense was provided "without a waiver of its right to contend there is no coverage and no duty to defend these lawsuits under the terms of the policy. Furthermore, [LMI] reserves the right to withdraw from the insureds' defense should the facts of its investigation make it clear there is no coverage. [LMI] also reserves the right to seek reimbursement of all costs incurred in the defense of the insureds and for any payments made in the settlement or on a judgment entered in this case, in the event it is determined [LMI] has no duty to defend or indemnify its insured."

[10]Under Civil Code section 3295, subdivision (c), such an order may only be made if the court finds upon "supporting and opposing affidavits presented, that the plaintiff has established that there is a *substantial probability* that the plaintiff will prevail on the [punitive damage claim]." (Italics added.)

[11]In *Sheldon Appel*, the Supreme Court adopted the *objective* standard to determine the presence or absence of probable cause. "[T]he probable cause element calls on the trial

question of whether the Downey plaintiffs had acted with malice.[12] Because of the exposure to liability and the risk of punitive damages, the Downey plaintiffs had demanded that LMI settle both cases. LMI agreed to do so. The O'Grady case was settled on April 5, 1995, for $600,000, to which LMI contributed $350,000.[13] One week later, on April 12, 1995, the Downey plaintiffs filed this action against LMI for breach of contract, breach of the implied covenant of good faith, and fraud. Shortly thereafter, the Watson case was settled. LMI's contribution to this settlement was $100,000.[14] LMI answered the complaint filed by the Downey plaintiffs and filed a cross-complaint for declaratory relief and reimbursement.[15]

In its cross-complaint, LMI alleged that it had conditioned its settlement of the O'Grady and Watson claims upon its right to seek reimbursement of any amounts paid in settlement and the Downey plaintiffs, having insisted those cases be settled, accepted that condition and were now liable to reimburse LMI for those sums. LMI also sought a declaratory judgment determining that it had no duty to defend or indemnify the Downey plaintiffs for the O'Grady and Watson claims, and that it was entitled to reimbursement of the settlement sums it paid to resolve both actions.

On November 20, 1995, the Downey plaintiffs filed a motion for summary adjudication of the issue as to whether LMI had a duty to defend the

court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]" (*Sheldon Appel, supra,* 47 Cal.3d at p. 878, italics in original.)

[12]To establish a cause of action for malicious prosecution, a plaintiff must prove that the prior action (1) had been commenced at the direction of the defendant and was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice. (*Sheldon Appel, supra,* 47 Cal.3d at p. 871.)

[13]Coverage counsel for the Downey plaintiffs recognized that LMI's contribution of $350,000 to the O'Grady settlement was under a complete reservation of rights including the right to recover both defense costs and indemnity amounts paid out by LMI in both the O'Grady and Watson actions.

[14]The Downey plaintiffs contributed nothing to the settlement of either the O'Grady or Watson actions. The difference between the total amounts paid to conclude the settlements and the amounts contributed by LMI was paid by other insurers.

[15]In its correspondence of June 12, 1995, to coverage counsel for the Downey plaintiffs, LMI made its position clear: "This letter is to again advise you that it is LMI's position that it is not obligated to indemnify the insureds for any damages awarded against them in the underlying lawsuit, resulting from their alleged malicious prosecution of Mr. Watson, as barred by Insurance Code section 533, as discussed in our prior correspondence. LMI again reasserts its position that there is no coverage and no duty to defend or indemnify under the terms of its policy. Again, LMI specifically reserves the right to litigate the issue of its defense and/or indemnity obligation and to litigate the various parties' obligations and rights to reimbursement of amounts it has paid [in] not only the Watson but also the O'Grady lawsuits."

O'Grady and Watson suits. While the motion did not specifically request a ruling on the duty to indemnify, the trial court reached that issue as well. It ruled that section 533 prohibited LMI from *indemnifying* for damages caused by malicious prosecution *irrespective of express language to the contrary in the insurance policy*. However, despite finding that there could never be an obligation to indemnify, the court stated that there was a distinction between the duty to defend and the duty to indemnify and found that "Section 533 does not prevent LMI from fulfilling its obligation to defend plaintiffs in accordance with the express provisions of its policy."[16]

LMI then made its own motion for summary adjudication of issues seeking reimbursement of settlement amounts paid in the O'Grady and Watson actions. LMI based this motion on the court's prior ruling that section 533 prevented it from indemnifying for malicious prosecution and on its continual reservation of its right to seek reimbursement of its settlement contributions. While the court found that LMI was entitled to obtain reimbursement, it also found that LMI could not recover the full amount paid toward the settlements. Rather, the court, concluded that LMI's reimbursement had to be reduced by any portion of the settlement payment which constituted "defense costs."[17]

---

[16]In a colloquy with counsel for the Downey plaintiffs, the court explained its views:

"The Court: 'My position is 533 prohibits indemnification period, and they can't pay it.'

"Mr. Shapiro: 'All [r]ight.'

"The Court: 'It's a violation of public policy . . .' "

The court then invited LMI to make a motion on the issue of indemnification stating:

"The Court: '. . . There's no question, then, I'm going to—when this is all done, you're going to hear me tell the other side to make a motion for summary judgment on the indemnification and as a matter of law they're entitled to that and I'll so rule. . . .' "

[17]At the hearing on this motion, the trial court explained its ruling as follows:

"The Court: '. . . So, going through this then and assuming that the only cause of action remaining at the time of settlement was for malicious prosecution, the issue is how to characterize the settlement money. That's the issue. How do you characterize the settlement money . . . and the only issue before the court is, what is it, was it indemnity or was it defense costs? And I have a triable issue of fact. [¶] You're going to have to determine— determine to the court and if they—and if it was indemnity, the right to have that back. If it was defense cost they don't get it back because they have a duty to defend, as I said before, but they don't have to indemnify. And that's the issue before the court and that's the issue that has to be resolved, and that's a triable issue of fact.

"Mr. Yuter [counsel for LMI]: Well your Honor, I'm a little perplexed as to how they could be defense costs. The money paid in settlement—

"The Court: Every time that I settle a case, every time I settle case, that's what they take into consideration; how much is it going to cost the defendant; . . .

"Mr. Yuter: Well it wouldn't—it wouldn't cost $450,000.

"The Court: I didn't say it did."

It appears that the trial court intended to reduce LMI's reimbursement claim by the amount of the defense costs which LMI may have *saved* by settling the two actions. This would require a determination of the portion of the $450,000 claim which could reasonably be

On July 29, 1996, LMI moved for summary judgment or, in the alternative, summary adjudication, on the remaining causes of action in the complaint for breach of contract, bad faith and fraud. The trial court found for LMI on the causes of action for breach of contract and bad faith. The court found LMI had provided a defense and had properly reserved its rights to seek reimbursement of all sums paid for indemnity and such rights could not be waived. The court stated that "the public policy of this State, as set forth in Insurance Code Section 533, and Civil Code Section 1668 does not permit the waiver of any such right." However, the court refused to dismiss the third cause of action for fraud. After the court ruled on the above referenced motions, the Downey plaintiffs dismissed the third cause of action for fraud *without prejudice* and LMI filed an amended cross-complaint.[18]

The court entered judgment on the amended pleadings as follows: (1) LMI was granted judgment on the first and second causes of action of the complaint for breach of contract and breach of the implied covenant of good faith and fair dealing; (2) on LMI's cross-complaint, the court ruled that LMI had a duty to defend the Downey plaintiffs in the O'Grady and Watson matters, even though section 533 and section 1668 precluded any duty to indemnify. In addition, LMI had properly reserved its rights to seek reimbursement of sums paid in settlement and was entitled to recover any sums which represented indemnity as opposed to costs of defense; and (3) the public policy of California did not permit any party to waive the provisions of sections 533 and 1668; but the policy as set forth in those statutes did not in and of itself preclude a claim for fraud based on the facts presented in the present matter.[19]

Neither LMI nor the Downey plaintiffs were happy with these rulings and both have filed timely appeals.

### Issues Presented

This case presents four issues for resolution. First, is indemnification coverage for malicious prosecution necessarily precluded as a "wilful act" within the meaning of section 533 even though expressly promised in the

---

allocated to defense costs and thus not subject to reimbursement since LMI had a duty to defend. (LMI did not seek to recoup any defense cost expenditures.)

[18]These amendments were apparently made because the parties agreed that the fraud and reimbursement issues had not been properly framed by the trial court. However, all legal issues were fully briefed and ruled on by the trial court.

[19]Apparently, the fraud claim was based on the theory that LMI, when it promised in the policy to provide coverage for malicious prosecution, had no intention of indemnifying the Downey plaintiffs on such a claim if it were ever filed and at all times LMI intended to assert the statutory exclusions in section 533 and section 1668.

policy? Second, even though section 533 may preclude indemnification, can an insurer's promise of a defense to a malicious prosecution claim nonetheless be enforced? Third, having expressly promised to provide liability coverage for damages awarded against an insured arising from a claim for malicious prosecution, is LMI estopped from relying on section 533 or can it be held liable in fraud for making a promise of coverage which it allegedly never intended to provide? Finally, where LMI provides and fully pays for a complete defense, and concludes a settlement of the action against its insured, and then seeks reimbursement of settlement funds from the insured, may the reimbursement claim be reduced by requiring an allocation of some portion of the settlement amount to defense costs *"saved"* by the settlement? We answer the first two questions in the affirmative and the remaining two in the negative.[20]

## DISCUSSION

### 1. *The Element of Malice in the Tort of Malicious Prosecution*

■ Central to the coverage issues presented by this case is the special nature of the tort of malicious prosecution and the public policies which inform our understanding and application of its three elements.[21] As one court put it, "Malicious prosecution is a disfavored action. [Citations.] This is due to the principles that favor open access to the courts for the redress of grievances. In fact, it has been held that access to the courts is a constitutional right founded upon the First Amendment to the United States Constitution. [Citations.] But regardless of any constitutional basis for the policy, it is beyond dispute that the strong public policy of this state favors open access to the courts for the resolution of conflicts. [Citations.] 'The courts of the state are open to every citizen for the redress of his wrongs, and unless he is at liberty to seek such redress without rendering himself liable in damages to the defendant, in case he shall fail to establish his complaint, this

---

[20]The issues presented by this appeal all relate to the impact of section 533 on a liability policy promising coverage for malicious prosecution and the legal consequences flowing to the parties from the insurer's assertion of section 533 as an exclusion to coverage. These are all legal issues which we resolve de novo. (*Goodstein* v. *Superior Court* (1996) 42 Cal.App.4th 1635, 1641 [50 Cal.Rptr.2d 459].)

[21]The malicious prosecution tort has ancient roots. Indeed, it goes back to the 10th or 11th century in Anglo-Saxon courts where the price for losing a suit was the loss of one's tongue. (See Note, *Groundless Litigation and the Malicious Prosecution Debate: A Historical Analysis* (1979) 88 Yale L.J. 1218, 1221.) Courts have long recognized the "chilling effect" of the tort on an ordinary citizen's willingness to report a crime or file a civil claim. (*Sheldon Appel,* supra, 47 Cal.3d at p. 872.) Thus, ". . . the elements of the tort have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Ibid.*)

right would in many instances be a barren privilege.' [Citation.] Accordingly, litigants have the right to present issues that are arguably correct even if it is extremely unlikely they will win. [Citations.] In view of these considerations the California Supreme Court has recently refused [in *Sheldon Appel*] to abandon or relax traditional limitations on malicious prosecution recovery. [Citation.]" (*Leonardini* v. *Shell Oil Co.* (1989) 216 Cal.App.3d 547, 566 [264 Cal.Rptr. 883].)[22]

■ In order to establish a cause of action for malicious prosecution of either a criminal or a civil proceeding, a plaintiff must demonstrate "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations]." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

■ The "malice" element, which is the one with which we are concerned in this matter, relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. (*Sheldon Appel, supra,* 47 Cal.3d at p. 874.) The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 429, 450 at pp. 511, 534). The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive. (*Ibid.*) It may range anywhere from open hostility to indifference. (See, e.g., *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 54 [attorney admitted filing suit because he " 'wanted to show the Appellate Court what a bastard Bertero was' "].)

In *Albertson* v. *Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405], the defendant had prosecuted an action against the plaintiff in which he sought both a

---

[22]In refusing to relax the rigid requirements for assertion of a malicious prosecution claim, the Supreme Court recognized that other remedies would be more effective in combating groundless litigation. "While the filing of frivolous lawsuits is certainly improper and cannot in any way be condoned, in our view the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded. In recent years, the Legislature has taken several steps in this direction, enacting legislation to facilitate the early weeding out of patently meritless claims and to permit the imposition of sanctions in the initial lawsuit—against both litigants and attorneys—for frivolous or delaying conduct. (See, e.g., Code Civ. Proc., §§ 437c, 1038, 128.5, 409.3.) Because these avenues appear to provide the most promising remedies for the general problem of frivolous litigation, we do not believe it advisable to abandon or relax the traditional limitations on malicious prosecution recovery." (*Sheldon Appel, supra,* 47 Cal.3d at pp. 873-874.)

money judgment and a lien on real property owned by the plaintiff or a judgment declaring that her title to the property in question had been obtained from her husband without consideration and in fraud of creditors. (*Id.* at p. 377.) After the plaintiff had successfully defeated that action, she filed an action for malicious prosecution against the defendant in which she alleged that he had no lien on or interest in her property and had knowingly and maliciously asserted false claims thereto. The court held that the element of malice was sufficiently alleged. "The malice required in an action for malicious prosecution is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted *primarily* for an improper purpose. [Citations.] It has been pointed out that the 'principal situations in which the civil proceedings are initiated for an improper purpose are those in which (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; [and] (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.' [Citation.]" (*Id.* at p. 383, italics added.)[23]

■ *Sheldon Appel* represents the Supreme Court's most recent consideration of the tort of malicious prosecution and, most particularly, the probable cause element of that tort. The court has rejected the notion that probable cause could be based upon a showing of reasonable investigation and diligent legal research on the part of an attorney as well as his or her subjective honest or reasonable belief in the merits of the claim asserted. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 878-879, 881-885.) The court's clarification of the rules applicable to probable cause has relevance to our concern with the issue of malice and the nature and character of the evidence necessary to prove it.

In its decision, the *Sheldon Appel* court departed from the approach adopted in earlier cases (see, e.g., *Runo* v. *Williams* (1912) 162 Cal. 444, 450

---

[23]This description of circumstances which will demonstrate an improper motive and thus the presence of "malice" is consistent with the way the term is defined by the Legislature when describing one of the elements which may be relied upon in order to justify an award of punitive damages: " '[m]alice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) However, we do not mean to suggest that a finding of malice sufficient to establish the tort of malicious prosecution *necessarily* means that punitive damages are also recoverable. Under Civil Code section 3294, a punitive damage recovery depends upon the satisfaction of a higher standard of proof (i.e., "clear and convincing" evidence) as to the existence of elements (e.g., "malice" and "oppression") which are specifically defined by the statute. (Civ. Code, § 3294, subd. (a).)

[122 P. 1082]; *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 639 [224 Cal.Rptr. 865]; *Grove* v. *Purity Stores, Ltd.* (1957) 153 Cal.App.2d 234, 240 [314 P.2d 543]). Those pre-*Sheldon Appel* cases held that probable cause could be established by evidence that the attorney had conducted (1) a reasonable investigation and (2) an industrious search of legal authority and, based thereon, had an "honest belief" that the asserted claim was legally tenable. As one court summarized the prior rule, " 'The test [for probable cause] is twofold. The attorney must entertain a subjective belief . . . that the claim merits litigation and that belief must satisfy an objective standard.' [Citation.] To meet the objective standard, the attorney must not prosecute 'a claim which a reasonable lawyer would not regard as tenable or by unreasonably neglecting to investigate the facts and law in making his determination to proceed, . . . .' [Citation.]" (*Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 639; see also *Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 382.)

*Sheldon Appel* has clearly altered this analysis. It involved an action for malicious prosecution against a law firm for filing and prosecuting an action against the plaintiff arising from a real estate dispute between the plaintiff and the defendant law firm's clients.[24] The court held that where there is no dispute as to the facts upon which an attorney acted in filing the prior action, the question of whether there was probable cause to institute that action is purely a legal question. (47 Cal.3d at p. 868.)[25] That legal question is "to be determined by the trial court on the basis of whether, *as an objective matter,* the prior action was legally tenable or not." (47 Cal.3d at p. 868, italics added.) The *subjective* beliefs of the defendant attorney as to legal tenability of the action are not relevant to the question of probable cause. "Whereas the malice element is directly concerned with the *subjective* mental state of the defendant in instituting the prior action, the probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an

---

[24]In *Sheldon Appel,* the court discussed the impact of the attorney's knowledge in the context of a suit for malicious prosecution brought against both the attorneys and their clients based on the prosecution of the prior action. These are the facts we have here. *Sheldon Appel's* focus on the actions, research, evaluation and knowledge of the defendant attorneys no doubt resulted from the fact that nonattorney defendants can usually demonstrate the existence of probable cause, and thus avoid liability, by evidence showing that they relied on the advice of counsel in good faith after full disclosure of the facts. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1556 [8 Cal.Rptr.2d 552].)

[25]If there is a dispute as to such facts, that dispute must be resolved by the trier of fact before the objective standard can be applied by the court. (*Sheldon Appel, supra,* 47 Cal.3d at p. 881; *Sosinsky* v. *Grant, supra,* 6 Cal.App.4th at p. 1557; *Leonardini* v. *Shell Oil Co., supra,* 216 Cal.App.3d at p. 569.)

*objective* standard to the facts on which the defendant acted. [Citation.] Because the malicious prosecution tort is intended to protect an individual's interest 'in freedom from unjustifiable and unreasonable litigation' [citation], if the trial court determines that the prior action was objectively reasonable, the plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant is entitled to prevail." (*Id.* at p. 878, italics in original.)

The court expressly rejected dicta in a number of appellate decisions (see e.g., *Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675, 683 [120 Cal.Rptr. 291]) to the effect that consideration of probable cause could take into account the attorney's lack of an "honest belief" that his or her client's claim was legally tenable. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 877-878.)[26] Despite what it described as language in some of its own earlier decisions which "are not as clear as they might be with respect to the 'objective' versus 'subjective' nature of the probable cause element,"[27] the court stated that, "properly understood," those decisions are consistent with the conclusion that the attorney's *subjective* belief in the legal tenability of the claim asserted in the client's prior action is *not* relevant to the issue of probable cause. (47 Cal.3d at pp. 879, 881.)[28] *Sheldon Appel* also rejected the suggestion set out in the dicta of the *Tool Research* decision and several cases which thereafter followed it (see, e.g., *Weaver* v. *Superior Court* (1979) 95 Cal.App.3d 166, 188-190 [156 Cal.Rptr. 745]; *Williams* v. *Coombs, supra,* 179 Cal.App.3d at pp. 640-644), that an attorney's reasonable investigation and industrious search of legal authority are essential components of probable cause. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 882-883.) The court held that such an approach constituted an improper shift in the focus of the inquiry away from the legal issue of objective tenability and towards the adequacy of the particular defendant's performance as an attorney. The court specifically held that the adequacy of the attorney's research was "not relevant to the probable cause determination." (*Id.* at p. 883.)

 Thus, probable cause depends entirely on an *objective* evaluation of legal tenability based on either (1) the facts known to the attorney at the time

---

[26]*Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675, and its progeny were disapproved to the extent that they are contrary to the conclusions reached by the *Sheldon Appel* court. (*Sheldon Appel, supra,* 47 Cal.3d at p. 883, fn. 9.)

[27]See *Franzen* v. *Shenk* (1923) 192 Cal. 572, 576-578 [221 P. 932]; *Albertson* v. *Raboff, supra,* 46 Cal.2d at page 382; *Bertero* v. *National General Corp., supra,* 13 Cal.3d at page 55.

[28]As the *Sheldon Appel* court put it, ". . . the issue of the attorney's subjective belief or nonbelief in legal tenability would rarely be susceptible of clear proof and, when controverted, would always pose a factual question [which would] in many cases effectively leave the ultimate resolution of the probable cause element to the jury, rather than to the court." (47 Cal.3d at p. 879.)

he or she brought the prior action (*Nicholson* v. *Lucas* (1994) 21 Cal.App.4th 1657, 1665-1666 [26 Cal.Rptr.2d 778]; *Leonardini* v. *Shell Oil Co., supra,* 216 Cal.App.3d at p. 570) or (2) subsequent events in the litigation which demonstrate, as a matter of law, that the prior action was *objectively* tenable. (*Hufstedler, Kaus & Ettinger* v. *Superior Court* (1996) 42 Cal.App.4th 55, 62, 64-66 [49 Cal.Rptr.2d 551].) Only if the court determines that such *objective* tenability is absent, will the jury be asked to determine the presence or absence of malice. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 874, 876-877.)

■ The refocus of the probable cause analysis brought about by *Sheldon Appel* has undercut the rule recognized in the older cases that malice could be inferred from the absence of probable cause. (See, e.g., *Runo* v. *Williams, supra,* 162 Cal. at p. 450; *Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 639, fn. 8; *Grove* v. *Purity Stores, Ltd., supra,* 153 Cal.App.2d at p. 241; *Jensen* v. *Leonard* (1947) 82 Cal.App.2d 340, 351 [186 P.2d 206].) Prior to *Sheldon Appel,* such a rule had a logical basis since, as the Supreme Court had previously said, ". . . probable cause requires a *reasonable belief* in the validity of the claim asserted." (*Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 382, italics added.) The absence of a reasonable belief in the claim, a factor relating to the defendant's *subjective* state of mind, would logically permit an inference that the prior action had in fact been prosecuted for an improper purpose. However, under the standard adopted in *Sheldon Appel,* the factor of a "reasonable" or "honest" belief in the claim asserted is no longer relevant to, nor a part of, the court's determination as to the existence of probable cause.

Thus, by itself, the conclusion that probable cause is absent logically tells the trier of fact nothing about the defendant's subjective state of mind. That being so, it does not seem logical to permit any inference to be drawn as to a *subjective* state of mind solely from the absence of *objective* tenability. Evidence Code section 600, subdivision (b), provides, "An inference is a deduction of fact that may *logically and reasonably* be drawn from another fact or group of facts found or otherwise established in the action." (Italics added.) Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [see *Sheldon Appel, supra,* 47 Cal.3d pp. 885-886]), *without more,* would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence.[29]

As we have discussed, that evidence must include proof of either actual hostility or ill will on the part of the defendant or a subjective intent to

---

[29]We do not mean to suggest, however, that the court's legal determination that probable cause is absent is not a fact or circumstance which the jury may consider in determining the

deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant. (See *Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 383.) In other words, in California, the commission of the tort of malicious prosecution requires a showing of an unsuccessful prosecution of a criminal or civil action, which any reasonable attorney would regard as totally and completely without merit (*Sheldon Appel, supra,* 47 Cal.3d at p. 885), for the intentionally wrongful purpose of injuring another person. This leads to our consideration of the question of whether the commission of this tort *necessarily* constitutes a wilful act.

## 2. *Section 533 Bars Indemnification for "Wilful" Acts*

 Section 533 precludes insurance coverage (i.e., indemnification) for a *"wilful act."*[30]

The purpose of such a prohibition is obviously to discourage wilful torts. (*Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571].) It reflects a fundamental public policy to deny insurance coverage for wilful wrongs. (*J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1019-1020 [278 Cal.Rptr. 64, 804 P.2d 689].)[31] It is an implied exclusionary clause which, by statute, must be read

---

presence of malice. We hold only that, standing alone, it is not sufficient to demonstrate malice.

[30]Section 533 is a recodification of former Civil Code section 2629, enacted in 1872 as part of the original Civil Code. (Former Civ. Code, § 2629 was repealed in 1935 and is now Ins. Code, § 533.) Section 2629 originally provided: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, nor by fraud or negligence on the part of his agents or others." The second clause of section 2629 was amended once, in 1874, to read: "but he is not exonerated by the negligence of the insured, or of his agents or others." (See Stats. 1873-1874, ch. 612, § 242, p. 256.) The first clause of section 2629, exonerating an insurer "for a loss caused by the wilful act of the insured," has survived without amendment since its enactment in 1872. (*Evans* v. *Pacific Indemnity Co.* (1975) 49 Cal.App.3d 537, 541 [122 Cal.Rptr. 680].)

In what appears to be the earliest case in which the California Supreme Court examined what is now section 533, the court stated the purpose of the section was to permit indemnity for negligent acts, no matter the degree of negligence, but to forbid indemnity for wilful acts of misconduct: "To set at rest questions involving the different degrees of negligence, and the results following therefrom, we may reasonably suppose was the object of the framers of our Civil Code. [¶] Under section 2629 of the Civil Code the nice distinctions often made necessary are dispensed with, and the general proposition is established that no form of negligence on the part of the insured, or his agents or others, leading to a loss avoids the policy, unless it amounts to a willful act on the part of the insured." (*McKenzie* v. *Scottish U. & N. Ins. Co.* (1896) 112 Cal. 548, 557-558 [44 P. 922].)

[31]As we discuss below, while this is the public policy of California, it is not one which is universally shared. In some other states, a greater emphasis is placed upon the enforcement of contracts and the compensation of injured third party claimants. In those states where such

into all insurance policies. (*Id.* at p. 1019.)[32] As a result, the parties to an insurance policy cannot contract for such coverage. (*Id.* at p. 1020, fn. 8.) The question we must answer is what is embraced in the term "wilful"?

Clearly, it is something more than mere negligence as, at a minimum, a wilful act is an *intentional* one. (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d at p. 1019.) Acts of gross negligence or recklessness are not wilful acts within the meaning of section 533. (52 Cal.3d at pp. 1020-1021.) For example, drunk driving, per se, is reckless conduct. Nonetheless, there may be coverage for an accident caused by drunk driving, notwithstanding section 533. (*Interinsurance Exchange* v. *Flores* (1996) 45 Cal.App.4th 661, 672 [53 Cal.Rptr.2d 18].) A willful act within the meaning of section 533 also means something more than the *intentional* doing of an act constituting ordinary negligence or the violation of a statute. (*B & E Convalescent Center* v. *State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 94 [9 Cal.Rptr.2d 894].)

A "wilful act" under section 533 will include either "an act deliberately done for the *express purpose* of causing damage or intentionally performed *with knowledge* that damage is highly probable or *substantially certain* to result." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 742 [15 Cal.Rptr.2d 815], italics added.) It also appears that a wilful act includes an intentional and wrongful act in which ". . . the harm is inherent in the act itself." (*J. C. Penney Casualty Ins. Co., supra,* v. *M. K., supra,* 52 Cal.3d at p. 1025.) In an earlier case, the Supreme Court had said that ". . . even an act which is 'intentional' or 'wilful' within the meaning of traditional tort principles will not exonerate the insurer from liability . . . unless it is done with a 'preconceived design to inflict injury.' " (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 887 [151 Cal.Rptr. 285, 587 P.2d 1098].) However, the issue to which the *Clemmer* court spoke involved a question of the insured's mental capacity. Subsequent decisions have made clear that the "preconceived design to injure" standard is relevant only when the insured's "mental capacity is an issue or the insured's intent or motive might justify an otherwise wrongful act." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 740; see also *J. C. Penney Casualty Ins.*

different policy choices are made, insurance coverage for damages arising from an insured's wilful acts is not precluded.

[32]Because the exclusion embodied in section 533 is a statute, the normal rules of contract interpretation do not apply. Rather, the rules of *statutory* construction control. (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d at p. 1020, fn. 9.) Thus, in interpreting this statutory language we do not construe any ambiguity which may exist against the insurer, but instead we construe the statutory language so as to effectuate the legislative purpose and intent. As we have already stated, that legislative purpose is both clear and unequivocal. It is to deny insurance coverage for wilful wrongs.

*Co.* v. *M. K., supra,* 52 Cal.3d at pp. 1021-1025.) Citing *J. C. Penney,* the *Shell Oil* court emphasized that "section 533 precludes *indemnification, whether or not the insured subjectively intended harm,* if the insured seeks coverage for an intentional, wrongful act that is inherently and necessarily harmful." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at pp. 740-741, italics added.)

Although it was speaking in the context of an environmental pollution case, the *Shell Oil* court properly summarized the rule which governs the scope and application of section 533: "We conclude that section 533 prohibits indemnification of more than just intentional acts that are subjectively desired to cause harm and acts that are intentional, wrongful, and necessarily harmful regardless of subjective intent. A 'wilful act' under section 533 must also include a deliberate, liability-producing act that the individual, before acting, expected to cause harm. Conduct for which the law imposes liability, and which is expected or intended to result in damage, must be considered wrongful and willful. Therefore, section 533 precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage." (12 Cal.App.4th at pp. 742-743.)

*J. C. Penney,* on which the *Shell Oil* court so heavily relied, represented a definitive clarification of California law with respect to the proper analytical approach to resolving issues raised under section 533 in a very specific fact situation (i.e., acts of sexual molestation where the insured argued that he had "intended no harm" to the minor victim). Perhaps because of those very specific facts, *J. C. Penney* had expressly limited the application of its reasoning and analysis to cases involving the sexual molestation of children. However, other courts have had no trouble extending these same principles to different factual circumstances where the defendant's act was both intentional and wrongful and the harm caused was inherent in or predictably resulted from the act. In those cases, the insurer's liability to indemnify for damages arising from the insured's intentional, wrongful and inherently or predictably harmful conduct was rejected in reliance on the statutory proscription in section 533. (See, e.g., *Michaelian* v. *State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1106-1107 [58 Cal.Rptr.2d 133] [claims against insured involved assault, battery and intentional infliction of emotional distress]; *Interinsurance Exchange* v. *Flores, supra,* 45 Cal.App.4th at pp. 672-673 [insured driver alleged to have aided and abetted assault with a deadly weapon in a drive-by shooting]; *Jacobs* v. *Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1278-1279 [42 Cal.Rptr.2d 906] [insured charged with unjustified, nonaccidental shooting of third party]; *Reagen's Vacuum Truck Service, Inc.* v. *Beaver Ins. Co.* (1994) 31 Cal.App.4th 375, 386-388 [37 Cal.Rptr.2d 89] [claim against insured employer involved serious and willful

violation of an employee's right to a safe workplace]; *Baker* v. *Mid-Century Ins. Co.* (1993) 20 Cal.App.4th 921, 924-925 [25 Cal.Rptr.2d 34] [insured sought recovery from insurer of attorneys' fees awarded under Code of Civil Procedure section 1021.4 in a personal injury case arising from insured defendant's felonious conduct]; *Aetna Casualty Surety Co.* v. *Superior Court* (1993) 19 Cal.App.4th 320, 330-331 [23 Cal.Rptr.2d 442] [insured alleged to have *induced* patent infringement, an act which is necessarily both intentional and knowing]; *Coit Drapery Cleaners, Inc.* v. *Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1603-1604 [18 Cal.Rptr.2d 692] [insured employer's president/principal shareholder and managerial employee were alleged to have engaged in acts of sexual harassment]; *California Casualty Management Co.* v. *Martocchio* (1992) 11 Cal.App.4th 1527, 1533 [15 Cal.Rptr.2d 277] [insured sought to recover from insurer sanctions for bad faith litigation tactics imposed pursuant to Code of Civil Procedure section 128.5]; *B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th at pp. 97-99 [insured employer sought indemnity and defense under an employer liability policy for employee's action for employment discrimination and retaliatory discharge]; *Fire Ins. Exchange* v. *Altieri* (1991) 235 Cal.App.3d 1352, 1358-1360 [1 Cal.Rptr.2d 360] [insured parents and teenage son sued for serious injuries caused by son's intentional physical assault upon another teenager]; *Studley* v. *Benicia Unified Sch. Dist.* (1991) 230 Cal.App.3d 454, 458-459 [281 Cal.Rptr. 631] [insured's son shot the victim at point blank range while merely "intending" to frighten her]; *Aetna Cas. & Sur. Co.* v. *Sheft* (9th Cir. 1993) 989 F.2d 1105, 1108 [insured movie star was sued for damages by his sexual partner, who alleged that movie star had engaged in "high risk sex" with partner *after* learning that he (the movie star) had AIDS]; *Empl. Ins. of Wausau* v. *Musick, Peeler, & Garret* (S.D.Cal. 1994) 871 F.Supp. 381, 386-387 [claim against insured was based on fraud and misrepresentation, including securities fraud]; *Save Mart Supermarkets* v. *Underwriters* (N.D.Cal. 1994) 843 F.Supp. 597, 605-606 [claim against insured involved disparate treatment discrimination claims]; *Trailer Marine Transport* v. *Chicago Ins. Co.* (N.D.Cal. 1992) 791 F.Supp. 809, 811-812 [claim against insured involved allegations of intentional violations of the Sherman Antitrust Act (15 U.S.C. § 1)]; *Allstate Ins. Co.* v. *Tankovich* (N.D.Cal. 1991) 776 F.Supp. 1394, 1397-1398 [claim against insured arose from racially motivated hate crimes]; *State Farm Fire & Cas. Co.* v. *Ezrin* (N.D.Cal. 1991) 764 F.Supp. 153, 155-157 [adult insured was charged with committing a nonconsensual sexual assault on an 17-year-old minor—the court refused to limit *J. C. Penney* to sexual assaults upon *children* under the age of 14 years].) ■ As we now discuss, what is true about all of these claims, and their intentional, wrongful and inherently or predictably harmful character, is also true about a claim for malicious prosecution.

### 3. *Section 533 Bars Indemnification for a Claim of Malicious Prosecution*

We do not write on an entirely clean slate. In *Maxon v. Security Ins. Co.* (1963) 214 Cal.App.2d 603 [29 Cal.Rptr. 586] and in *State Farm Fire & Casualty Co.* v. *Drasin* (1984) 152 Cal.App.3d 864 [199 Cal.Rptr. 749], it was held that coverage for a malicious prosecution claim was precluded by section 533.

In *Maxon,* the insured was a store owner who had received a check from a customer which was later returned by the bank marked "account closed." Maxon then filed a complaint with the district attorney and the customer was arrested. However, the criminal complaint was later dismissed and the customer sued Maxon for malicious prosecution. When Maxon tendered defense of the action to his insurer, coverage was denied and a defense was refused. Maxon then sued the insurer to recover the sums he had expended in successfully defending against the customer's action. The matter was submitted to the trial court on the legal question of whether the language of the policy required the insurer to reimburse Maxon for his defense costs and expenses. Relying on section 533, the trial court granted summary judgment in favor of the insurer. In its opinion affirming that judgment, the Court of Appeal held that the liability policy issued to Maxon provided coverage for bodily injury sustained by any person " ' "*caused by accident and arising out of the retail store hazard.*" ' " (214 Cal.App.2d at p. 611.) Although there was no specific policy reference to "malicious prosecution," the court in *Maxon* held that the policy language would provide coverage for a claim arising from such a tort *except for the preclusion of section 533*. Emphasizing that absent evidence of malice an insured would never be held liable for any damages based on a claim of malicious prosecution, the court stated, " 'The element of malice necessarily involves the process of the mind and its thinking.' [Citation.] Malice imports willfulness; and, accordingly, in our opinion, is a 'willful act' within the meaning of section 533." (214 Cal.App.2d at p. 616.)

In *Drasin*, State Farm filed an action for declaratory relief to determine whether it had any duty to defend or indemnify its insured (under a home-owner's policy) in an action for malicious prosecution filed against him by a third party. A summary judgment in favor of State Farm was affirmed. The *Drasin* court relied entirely on *Maxon* when it held: "The malicious prosecution complaint filed against the Drasins does not potentially seek damages that come within the coverage of the subject policy. If the Drasins' original action against Covell is held to be without malice and therefore not wilful, then there is no liability under the policy. Similarly, if the Drasins' original

action against Covell is held to be wilful and with malice, again there is no liability under the policy. (See Ins. Code, § 533.) '*The obligation to defend is predicated upon liability for a loss covered by the policy.*' (*Maxon* v. *Security Ins. Co., supra,* 214 Cal.App.2d at p. 616; italics added.) Therefore, since State Farm could not be liable under the policy for damages predicated upon the tort of prosecution, it is not obligated to defend such an action." (*State Farm Fire & Casualty Co.* v. *Drasin, supra,* 152 Cal.App.3d at pp. 868-869.)

Other courts have been less definitive as to the impact of section 533 on a claim for malicious prosecution. In *City Products Corp.* v. *Globe Indemnity Co.* (1979) 88 Cal.App.3d 31 [151 Cal.Rptr. 494], we held that there was no coverage for a punitive damage award made in a malicious prosecution case. While that case involved a "personal injury" coverage clause like we have here, our holding of noncoverage was directed at and limited to the punitive award which had been made in the underlying action. Unlike the case before us, the defendant insurer had not denied coverage as to the claim of malicious prosecution itself and, indeed, had promptly paid the compensatory damage award which had been made. Thus, we were not called upon to reach the issue which is presented by this case.

Similarly, in two other cases the appellate court simply *assumed* that insurance coverage for malicious prosecution was available but found no coverage because of when the tort was committed. (*Harbor Ins. Co.* v. *Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1043 [211 Cal.Rptr. 902]; *Zurich Ins. Co.* v. *Peterson* (1986) 188 Cal.App.3d 438, 448 [232 Cal.Rptr. 807].) In both of these cases, the policies also expressly provided for malicious prosecution coverage.

However, in *California Casualty Management Co.* v. *Martocchio, supra,* 11 Cal.App.4th at page 1535-1536, the court rejected this distinction and asserted that *Maxon* had correctly stated the rule and it did not matter whether coverage was based on an "occurrence" or a "personal injury" clause. In *California Casualty*, Martocchio, the insured, sued a broadcaster for slander. The action was dismissed by the trial court because Martocchio failed to bring the case to trial in a timely fashion. The court also determined, upon a motion made by the defendant broadcaster, that Martocchio had engaged in bad faith litigation tactics. A sanction of $216,460 was awarded under Code of Civil Procedure section 128.5 on the grounds that (1) Martocchio had engaged in bad faith actions or tactics in filing and maintaining the lawsuit, and (2) the action was "totally and completely without merit." Martocchio then demanded that California Casualty, his liability insurer, pay the sanctions award. The insurer denied the claim and filed an action for declaratory relief to determine the issue of its liability. The trial

court granted summary judgment in favor of the insurer and the Court of Appeal, relying on section 533, affirmed. It held that bad faith litigation tactics which are frivolous or solely intended to cause unnecessary delay are always intentional and wrongful and the resulting harm is inherent as a matter of law. (*California Casualty Management Co.* v. *Martocchio, supra,* 11 Cal.App.4th at p. 1534.) Such acts, the court held, are patently "wilful" and insurance coverage is proscribed by section 533. (11 Cal.App.4th at p. 1534.) Although the policy contained provisions promising (personal injury) coverage for malicious prosecution, the court rejected Martocchio's argument that his actions were analogous to that tort so as to warrant coverage for the court-imposed sanctions. The court held that even if Martocchio's analogy argument had merit, there still would be no coverage. Relying on the decision in *Maxon,* the court concluded that coverage was not available for malicious prosecution. The court held that section 533 bars insurance coverage for any wilful acts—as a matter of statutory, not contractual, interpretation. (11 Cal.App.4th at p. 1535.)

In *B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th 78, we were presented with the question of whether there could be any liability coverage for claims of employer discrimination on the basis of the employee's age, gender or ethnicity, and retaliatory termination for the purpose of interfering with statutorily protected collective bargaining rights. These claims were based on allegations that the insured employer had wrongfully discharged the employee claimant in violation of state and federal laws proscribing (1) discrimination on the basis of age, gender or ethnic origin and (2) termination effected for the purpose of defeating established labor union rights. Clearly, such claims could only be established by evidence of an employer's motive and intent to violate or frustrate laws declaring fundamental public policy. We pointed out, albeit in a different factual context, that "[a]n affirmative act which can only violate the law when it is accompanied by such an impermissible motivation *necessarily* involves willful and intentional misconduct." (*Id.* at p. 95, italics in original, fn. omitted; see also *Trailer Marine Transport* v. *Chicago Ins. Co., supra,* 791 F.Supp. at pp. 811-812.)

Thus, in *B & E Convalescent Center,* the insured's alleged misconduct would only be actionable if the insured had acted with an improper and legally impermissible motive or purpose. The same is true with respect to malicious prosecution. The commission of that tort necessarily involves, indeed requires, an impermissible motivation. An insured can only be found liable for malicious prosecution if the insured is found to have possessed "actual hostility or ill will toward plaintiff [or if] . . . the proceedings are instituted primarily for an improper purpose." (*Albertson* v. *Raboff, supra,* 46

Cal.2d at p. 383.) As the court in *Sheldon Appel, supra,* explained, ". . . the malice element is directly concerned with the *subjective* mental state of the defendant in instituting the prior action, . . ." (47 Cal.3d at p. 878, italics in original.)

The presence of such hostility, ill will or improper motivation is sufficient to establish the tort of malicious prosecution as not only an intentional act, but one that is wrongful; and it is necessarily harmful to both the plaintiff and the judicial process. As the Supreme Court has clearly stated, "[t]he malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice. The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings. . . . [¶] The judicial process is adversely affected by a maliciously prosecuted cause not only by the clogging of already crowded dockets, but by the unscrupulous use of the courts by individuals '. . . as instruments with which to maliciously injure their fellow men.' [Citation.]" (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at pp. 50-51.) Such harm and injury is both inherent and predictable.

We therefore conclude that the commission of this tort constitutes a wilful act within the meaning of section 533. As a result, there can be no indemnification under the LMI policy as it is clearly precluded by that statutory provision. However, as we shall now discuss, that does not mean that there was no coverage provided to the Downey plaintiffs under that policy.

### 4. *Section 533 Does Not Preclude a Promised Defense to a Malicious Prosecution Claim*

■ The general rules applicable to an insurer's duty to defend were summarized by the Supreme Court in *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at page 1081: "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] As we said in *Gray* [v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168]], 'the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty

to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. . . . [¶] Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. [Citations.] Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. [Citation.]" (Italics in original; see also *Buss* v. *Superior Court, supra,* 16 Cal.4th at pp. 45-46.) Put another way, a liability insurer is obligated to provide a defense to any claim which is *potentially* covered under the terms of the policy and in light of the claim(s) asserted as defined by the pleadings in the action filed against the insured and by other facts or circumstances of which the insurer has knowledge. (*Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 46; *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

Conversely, in an action filed against the insured in which there is *no* potential that the insurer will have to provide indemnification, then, as a general rule, there is no duty to defend. (*Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 47.) ▆▆ In this case, we have concluded that the Downey plaintiffs have no right of indemnification under the policy. The question which therefore arises, given the clear language of *Buss,* is why does that conclusion not also foreclose any obligation on LMI's part to provide a defense? The answer is found in the language of LMI's policy.

The personal injury section of the policy promises to *both* indemnify *and* defend any claims arising from certain specified "offenses" committed during the policy period. One of those "offenses" is malicious prosecution. In other words, there is a specific and express promise of both indemnity and defense coverage. Such language, absent the impact of section 533, would most certainly justify the conclusion of the reasonable policyholder that there was full coverage; and, indeed, but for section 533, there would be. However, as we have explained, *indemnity* coverage *is* precluded, the policy language to the contrary notwithstanding. Parties to a contract of insurance have no power to provide for coverage barred by section 533. (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d at pp. 1019-1020, fn. 8.)

However, while indemnification of such claim is precluded by section 533, that conclusion does not apply to LMI's defense commitment which, in this policy, is a specific and distinct commitment. With respect to that part of LMI's promise, section 533 presents no barrier. As we stated in *B & E*

*Convalescent Center*, " '[S]ection 533 precludes only *indemnification* of wilful conduct and not the *defense* of an action in which such conduct is alleged. [Citation.] . . . [¶] [E]ven though public policy or section 533 precludes an insurer from indemnifying an insured in an underlying action the duty to defend still exists so long as the "insured reasonably expect[s] the policy to cover the types of acts involved in the underlying suit[.]" [Citation.]' [Citation]. Put another way, 'if the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying that claim.' [Citation.]" (*B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th at p. 93.)

In *B & E Convalescent Center*, we stated that we read this "statement of principle to mean only that an insurer and an insured are free to contract for the provision of a defense to a claim which can not be indemnified. That is, if an insured either expressly purchases a defense without regard to indemnification (e.g., a litigation policy) or is led by the terms of the insurance agreement, whether those terms be clear or ambiguous, to reasonably expect a defense to the type of claim asserted, then a defense may be required even though there can legally be no duty to indemnify because of section 533." (8 Cal.App.4th at p. 101.)[33] Obviously, the public policy concerns applicable to an insurer's indemnification do not extend to the provision of a defense. An agreement to *defend* an insured " 'upon mere accusation of a wilful tort does not encourage such wilful conduct.' [Citation.]" (*Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at p. 1087; see also *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 935, fn. 9 [214 Cal.Rptr. 567].)

We are aware that the two cases heavily relied upon by LMI to demonstrate that no duty to indemnify exists (*Maxon* v. *Security Ins. Co., supra,* 214 Cal.App.2d 603 and *State Farm Fire & Casualty* v. *Drasin, supra,* 152 Cal.App.3d 864) also held that the insurer had no duty to provide a defense. Those cases are not controlling for two good reasons. First, the principles which we have discussed above regarding the impact of section 533 on the insurer's defense obligation spring from the Supreme Court's landmark decision in *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], which was decided over three years after the decision in *Maxon.* Thus, neither *Maxon* nor *Drasin* (which relied entirely on *Maxon*) is compelling authority for LMI's argument.

---

[33]Under settled principles of policy interpretation and construction the focus is upon the insured's *objectively* reasonable expectations. (See *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265, 1276 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) Thus, any ambiguity which may exist in policy language will be resolved in a manner which is consistent with such expectations.

Secondly, in each of those cases, the insured sought coverage under the general liability provisions relating to claims for alleged bodily injury. Coverage depended upon demonstrating the existence of an "accident" arising out of a "retail store hazard."[34] Unlike the case before us, there was no separate specific promise of a defense for the tort of malicious prosecution. To us, this distinction is important. Here, there was a distinct promise to provide a defense and such express commitment certainly would create a reasonable expectation on the part of the Downey plaintiffs that a defense would be provided. "In those cases where insurance coverage [i.e., indemnification] is precluded by section 533, an insurer's duty to defend must also be measured by the reasonable expectations of the insured in light of the nature and kinds of risks covered by the policy. [Citation.]" (*B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th at p. 99.)[35] In this case, the express promise to provide a defense to malicious prosecution claims was clearly sufficient to create an objectively reasonable expectation in the Downey plaintiffs that a defense would be provided.

A similar defense obligation was recognized in *Melugin* v. *Zurich Canada* (1996) 50 Cal.App.4th 658 [57 Cal.Rptr.2d 781]. *Melugin* held that section 533 did not relieve Zurich from its obligation to defend a discrimination claim against Melugin under a policy that expressly covered discrimination: "The bottom line in this case is that Zurich explicitly offered its insureds coverage for claims alleging liability for 'discrimination[.]' . . . . The provisions of section 533 applied to this case do not relieve Zurich of the broad duty to defend, *even though it would have been entitled, in performing that duty, to reserve its right to contest its liability to indemnify.*" (50 Cal.App.4th at p. 669, italics added.)

We therefore conclude, despite section 533, that LMI owed to the Downey plaintiffs a duty to defend. In fact, in this case, LMI did provide a full defense which resulted in the ultimate settlement of the underlying action. Nonetheless, the issue is not moot because the existence of the defense obligation is relevant to the claim of the Downey plaintiffs that if

[34]In *Maxon,* the policy terms relating to the promise of a defense read: " 'Defense. . . . With respect to such insurance as is aforded [*sic*] by this policy, the Company shall (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent[.]' " (214 Cal.App.2d at p. 607.) The court's opinion in *Drasin* does not disclose the relevant policy terms. However, inasmuch as the *Drasin* court deemed the issues before it to be "controlled" by *Maxon* (152 Cal.App.3d at p. 867), we can only assume the insurance policy in that case likewise contained no separate specific commitment to defense coverage for malicious prosecution.

[35]To the extent that *Maxon* and *Drasin* can be read to reach a contrary conclusion with respect to an insurer's duty to defend a claim which would otherwise be covered except for the preclusive effect of section 533, we respectfully decline to follow them.

LMI's coverage arguments are sustained, then the coverage which the policy purported to provide was illusory. In addition, it is relevant to our consideration of LMI's cross-appeal relating to the trial court's order to reduce LMI's reimbursement claim by the amount of "saved" defense costs.

5. *LMI's Assertion of the Bar of Section 533 Does Not Provide a Basis for Either Estoppel or Promissory Fraud*

a. *Downey Cannot Demonstrate the Justifiable Reliance Necessary to Any Claim of Estoppel or Promissory Fraud*

 "The essentials [of estoppel] are: (1) Knowledge of the facts by the party to be estopped; (2) intention that his conduct be acted upon, or he acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) justifiable reliance on the conduct by the party asserting the estoppel to his injury." (*Busse* v. *Pacific Employers Ins. Co.* (1974) 43 Cal.App.3d 558, 570, fn. 11 [117 Cal.Rptr. 718].)

 " 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or non-disclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

 Thus, both estoppel and promissory fraud require proof that the party asserting the fraud or the estoppel *justifiably relied* on a promise or conduct by the party against whom the fraud or estoppel is asserted. However, no insureds can plausibly maintain that they perpetrated acts of malicious prosecution in justifiable reliance on an insurer's promise to save them from the consequences of such acts. Malicious prosecution is never justified.

To find justifiable reliance under these circumstances would effectively repeal section 533 in cases involving malicious prosecution. Every policy provision promising coverage for malicious prosecution would result in indemnity for the insured on the theory that the insured relied on the insurer's promise in perpetrating the act. The result would be to liberate insureds from the consequences of their own acts of malicious prosecution, in clear contravention of the public policy expressed in section 533.

However, even if we disregard the issue of justifiable reliance, there are still substantial reasons why the Downey plaintiffs cannot successfully rely on either estoppel or promissory fraud.

### b. *LMI Is Not Estopped From Asserting the Bar of Section 533*

Section 533 protects the insurer, its innocent policyholders, and the insurance-buying public in general, from having to bear the consequences of one insured's wilful act of malicious prosecution. Wrongdoers cannot be allowed to defeat this public policy and escape the consequences of their conduct by invoking the doctrine of estoppel. As the Supreme Court recognized in *Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d at pages 648-649, estoppel cannot be relied upon to compel performance of a promise to indemnify for an insured's wilful wrong. In spite of this, the Downey plaintiffs rely heavily on *Tomerlin* because it sanctioned a recovery by the insured on an estoppel theory. However, that reliance is misplaced. What *Tomerlin* did do was hold that an insurer can be held liable to an insured on an estoppel theory for representations concerning the promise of coverage which were made *after* the "wilful" tort had allegedly been committed and on which promise the insured relied in dispensing with the services of his personal attorney in the underlying action and permitting counsel selected by the insurer to defend him. ▮ The policy reflected in section 533 is not offended by the enforcement of a post-tort coverage commitment by the insurer. (*Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d at p. 648.)

▮ In addition, to require indemnification in defiance of the provisions of section 533 on the ground that the terms of the policy promise the proscribed coverage would amount to the enforcement of an illegal contract. ▮ An illegal contract is void; it cannot be ratified by any subsequent act, "and no person can be estopped to deny its validity. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 442 at p. 396, italics omitted.) ▮ It is clear that estoppel cannot be relied upon to defeat the operation of a policy protecting the public. (*Garamendi* v. *Mission Ins. Co.* (1993) 15 Cal.App.4th 1277, 1289 [19 Cal.Rptr.2d 190].)[36]

---

[36]We also reject the related argument made by the Downey plaintiffs that LMI, by its unconditional acceptance of the initial tender of the defense of the O'Grady action, waived its right to thereafter assert section 533 as a bar. First, that argument contravenes Civil Code section 3513 which provides: "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." Second, a defense of illegality cannot be waived either by agreement or the failure to raise or plead it. The provisions of a statute established for a public purpose and constituting an expression of public policy may not be waived. (*Cook* v. *King Manor and Convalescent Hospital* (1974) 40 Cal.App.3d 782, 793 [115 Cal.Rptr. 471].)

### c. The LMI Policy Does Provide Significant Coverage for Malicious Prosecution Claims and Thus No Promissory Fraud Claim Is Viable

While, as we have already discussed, there can be no indemnification under the LMI policy for an insured who *personally* is held liable for the tort of malicious prosecution, it does not follow that the policy provides no coverage at all. As noted above, promissory fraud requires proof that the promisor misrepresented his intention to perform the promise. The Downey plaintiffs contend that, if section 533 bars indemnity for acts of malicious prosecution, an insurer cannot honestly promise coverage for such an act. That argument is unsound because it rests on the false assumption that the policy provision promising coverage for malicious prosecution affords *no* benefits or protections to the insured. In fact, substantial coverage benefits are provided to California insureds by policies promising such coverage. Those benefits are (1) a defense to any such claim, (2) indemnification for *vicarious* liability for malicious prosecution and (3) unrestricted coverage for such claims arising in jurisdictions which do not have a public policy similar to that existing in California. With respect to a right to a defense to such a claim, we have already explained that such a right exists and it is *not* precluded by section 533. We now discuss the other two circumstances where full coverage is available.

### (1) Coverage for Vicarious Liability

 Although section 533 bars indemnity of an insured who *personally* commits an act of malicious prosecution, the statute does not bar indemnity of an insured who does not personally commit the act but who is vicariously liable for another person's act of malicious prosecution. "The rule of respondeat superior is familiar and simply stated: an employer is vicariously liable for the torts of its employees committed within the scope of the employment. [Citation.] Equally well established, if somewhat surprising on first encounter, is the principle that an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts." (*Lisa M.* v. *Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296-297 [48 Cal.Rptr.2d 510, 907 P.2d 358], fn. omitted; see also *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 209 [285 Cal.Rptr. 99, 814 P.2d 1341] [acts that "are willful or malicious in nature" may fall within the scope of employment and subject the employer to liability]; *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 618 [262 Cal.Rptr. 842] ["An employer is liable for the wilful and malicious torts of its employees committed in the scope of employment"].) Similarly, "[a] partnership is liable for all wrongful acts

committed by a partner in the ordinary course of business[.]" (*American States Ins. Co.* v. *Borbor by Borbor* (9th Cir. 1987) 826 F.2d 888, 892; see also Corp. Code, § 15013.)

Thus, a principal who *personally* engages in no misconduct may be vicariously liable for an act of malicious prosecution committed by an agent within the course and scope of the agency. (See *Lujan* v. *Gordon* (1977) 70 Cal.App.3d 260, 262 [138 Cal.Rptr. 654] [all partners in law firm exposed to liability for malicious prosecution as the result of malicious action filed by one partner]; *Kappel* v. *Bartlett* (1988) 200 Cal.App.3d 1457, 1466 [246 Cal.Rptr. 815] [under the doctrine of respondeat superior, employer could be liable for agent's abuse of process].) Likewise, a corporation may be liable for an act of malicious prosecution committed within the scope of its agent's authority to act for and on behalf of the corporation. (*Centers* v. *Dollar Markets* (1950) 99 Cal.App.2d 534, 544 [222 P.2d 136].)

Where a principal is held vicariously liable for an agent's act of malicious prosecution, section 533 poses no obstacle to indemnifying the principal: "An exception to the rule stated in *Maxon* [barring indemnity for malicious prosecution] exists with respect to insureds held vicariously liable for compensatory damages caused by the willful tort of another. . . . '*Section 533 of the Insurance Code, . . . has no application to a situation where the plaintiff is not personally at fault.* [Fn. omitted.]' " (*City Products Corp.* v. *Globe Indemnity Co., supra,* 88 Cal.App.3d at pp. 37-38, italics added, quoting *Arenson* v. *Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816]; see also *California State Auto. Assn. Inter-Ins. Bureau* v. *Carter* (1985) 164 Cal.App.3d 257, 263 [210 Cal.Rptr. 140, 54 A.L.R.4th 1177]; *Lisa M.* v. *Henry Mayo Newhall Memorial Hospital, supra,* 12 Cal.4th at p. 305, fn. 9 ["Neither Insurance Code section 533 nor related policy exclusions for intentionally caused injury or damage preclude a California insurer from indemnifying an employer held vicariously liable for an employee's willful acts"]; *Melugin* v. *Zurich Canada, supra,* 50 Cal.App.4th at p. 666 ["section 533 would not necessarily bar coverage to Canada Life for its own strict liability as a result of Melugin's wrongful [discriminatory] acts"]; *Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 1001 [216 Cal.Rptr. 796] [section 533 did not bar insurer from indemnifying city that was vicariously liable for its agent's fraud under the doctrine of respondeat superior]; *American States Ins. Co.* v. *Borbor by Borbor, supra,* 826 F.2d at p. 894 [section 533 barred insurer from indemnifying first partner, who committed wilful acts, but not second partner, who was vicariously liable for those acts]; see *Dart Industries, Inc.* v. *Liberty Mutual Insurance Co.* (9th Cir. 1973) 484 F.2d 1295, 1297 [section 533 did not bar coverage where corporation's liability was based on respondeat superior].

The public policy underlying section 533—to deny coverage for and thereby discourage commission of wilful wrongs—is not implicated when an insurer indemnifies an "innocent" insured held liable for the willful wrong of another person: "The public policy against insurance for losses resulting from such [wilful criminal] acts is usually justified by the assumption that such acts would be encouraged, or at least not dissuaded, if insurance were available to shift the financial burden of the loss from the wrongdoer to the insurer. . . . This policy, however, does not apply when the wrongdoer is not benefited and an insured who is innocent of the wrongdoing receives the protection afforded by the contract of insurance." (*American States Ins. Co.* v. *Borbor by Borbor, supra*, 826 F.2d at p. 895, citations omitted.)

### (2) *Coverage for Claims Arising in Other Jurisdictions*

■ With respect to the availability of coverage under the LMI policy for claims arising in other jurisdictions, there is no reason to believe that California would interpose *its* public policy concerns, as expressed in section 533, to preclude indemnification under the policy if such a result was not required by the law of the other jurisdiction.

A liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. (See *Stonewall Surplus Lines Ins. Co.* v. *Johnson Controls, Inc.* (1993) 14 Cal.App.4th 637, 646-647 [17 Cal.Rptr.2d 713].) Thus, the same policy language may receive different construction and application in different jurisdictions. Parties to an insurance contract understand this. Indeed, many such policies expressly provide that the policy will be deemed amended to conform to the requirements and limitations of local law.[37] This sort of provision alerts the insured to the fact that, notwithstanding the general language of the policy, coverage may vary in accordance with local law but the insurer "will honor its obligations *whatever* they are" under that law. (*St. Paul Mercury Ins. Co.* v. *Duke University, supra,* 670 F.Supp. at p. 635, fn. 14, italics in original.)

---

[37]See, for example, *St. Paul Mercury Ins. Co.* v. *Duke University* (M.D.N.C. 1987) 670 F.Supp. 630, 635 (" 'Any part of this policy that conflicts with state law is *automatically changed* to conform to the law' " [italics in original]) affd. in part and revd. in part (4th Cir. 1988) 849 F.2d 133; *Rao* v. *Universal Underwriters, Ins.* (1988) 228 N.J. Super. 396, 411 [549 A.2d 1259, 1267] (" 'If any part of this policy is in conflict with state law, those provisions in conflict will automatically change to conform to the law' "); *Sonoco Bldgs., Inc.* v. *American Home Assur. Co.* (7th Cir. 1989) 877 F.2d 1350, 1352 (" 'Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes' "); *Bonfils* v. *Pacific Auto Ins. Co.* (1958) 165 Cal.App.2d 152, 159 [331 P.2d 766] (same).

In some states, unlike in California, public policy does *not* forbid an insurer from indemnifying its insured against liability for the insured's wilful misconduct. In those jurisdictions, the public policies favoring enforcement of contracts and compensation of injured third parties are considered paramount and outweigh any concerns about indemnifying wilful wrongdoers. Accordingly, in those jurisdictions, an insurer's agreement to cover malicious prosecution and other wilful misconduct will be enforced as written.[38]

In addition, other states, unlike California, allow a plaintiff to recover for malicious prosecution without proving the defendant acted with malice in fact, i.e., with an improper motive or purpose. In those jurisdictions, liability rests on malice in law, which is presumed from proof the defendant intentionally committed a wrongful act without just cause or excuse.[39] Thus, whether because they allow indemnity for wilful misconduct or because they do not include malicious prosecution in that category, many jurisdictions will enforce an insurer's agreement to indemnify an insured who personally

---

[38]See, for example, *Sch. Dist. for City of Royal Oak* v. *Continental Cas.* (6th Cir. 1990) 912 F.2d 844, 847-850 (Michigan public policy did not prohibit insurer from indemnifying insured against liability for intentional religious discrimination), overruled on other grounds by *Salve Regina College* v. *Russell* (1991) 499 U.S. 225 [111 S.Ct. 1217, 113 L.Ed.2d 190]; *New Madrid School Dist. No. 1* v. *Continental Cas.* (8th Cir. 1990) 904 F.2d 1236, 1241-1243 (Missouri public policy would not prohibit coverage for insured's intentional acts where policy provides for such coverage); *Titan Indem. Co.* v. *Riley* (Ala. 1996) 679 So.2d 701, 705-707 (Alabama public policy did not prohibit enforcement of insurer's agreement to indemnify insureds against liability for malicious prosecution and civil rights violations); *Indep. School D. 697* v. *St. Paul F. & M.* (Minn. 1994) 515 N.W.2d 576, 579-580 (Minnesota public policy did not prohibit insurer from indemnifying insured against liability for intentional discrimination; contract would be enforced as written); *University of Illinois* v. *Continental Cas.* (1992) 234 Ill.App.3d 340, 359 [175 Ill.Dec. 324, 599 N.E.2d 1338, 1351] (". . . there is no Illinois public policy prohibiting insuring for damages caused by one's intentional acts [of misconduct] except to the extent that the insured wrongdoer may not be the person who recovers the policy proceeds").

[39]See for example, *Alamo Rent-A-Car, Inc.* v. *Mancusi* (Fla. 1994) 632 So.2d 1352, 1357 ("In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others"); *Morgan Intern. Realty* v. *Dade Underwriters* (Fla.Dist.Ct.App. 1993) 617 So.2d 455, 458 (legal malice may be inferred from circumstances "even though no actual malevolence or corrupt design is shown"); *Proctor* v. *Stevens Employment Services, Inc.* (Mo. 1986) 712 S.W.2d 684, 687 (malice in law suffices to sustain an action for malicious prosecution of a civil action); *Abbitt* v. *Bartlett* (1960) 252 N.C 40, 43 [112 S.E.2d 751, 754] ("Where only compensatory damages are sought [for malicious prosecution], . . . it is sufficient if plaintiff proves legal malice alone, that is, that the prosecution was wrongfully, knowingly and intentionally maintained without just cause or excuse"); *F. B. C. Stores, Inc.* v. *Duncan* (1973) 214 Va. 246, 252 [198 S.E.2d 595, 600] ("The rule in Virginia is that in suits for malicious prosecution legal malice inferred from circumstances is sufficient to support an award of compensatory damages").

commits an act of malicious prosecution.[40] There is no reason to believe a California court would not enforce a contractual promise of indemnity against liability for malicious prosecution where the liability was incurred in a jurisdiction that does not require proof the insured acted with malice in fact.

For all of these reasons, we conclude that LMI's policy provisions describing coverage for "malicious prosecution" was hardly an empty or illusory promise. Those provisions included a valuable and enforceable commitment to provide (1) a defense to any such claim, (2) a defense *and* indemnification for any such claim which resulted in an award of damages based on the insured's vicarious liability and (3) a defense *and* indemnification for such claims arising in jurisdictions which do not have a public policy or restrictive statutes precluding indemnification for malicious prosecution or which define the tort in a different manner. In addition, the record clearly reflects that LMI fully performed its defense obligation and even advanced substantial settlement funds so as to protect the Downey plaintiffs from the very real risk of a punitive damage award. Thus, as a matter of law, the Downey plaintiffs cannot demonstrate that LMI sold its policy without any intention to perform. As a result there is no basis for a claim in promissory fraud.[41]

### 6. *LMI Is Entitled to a Full Reimbursement of Sums Advanced to Settle the Malicious Prosecution Claims*

It is not disputed that LMI contributed $450,000 to a settlement of the malicious prosecution claims which had been filed by O'Grady and Watson. Indeed, it is clear that this settlement was made at the insistence of the Downey plaintiffs who had every reason to be concerned about the outcome of that litigation after the trial court had adversely resolved the probable cause issue and determined that there was a substantial probability

---

[40]See, for example, *Morgan Intern. Realty* v. *Dade Underwriters, supra,* 617 So.2d at page 459 (holding insurer had duty to indemnify insured against compensatory damages awarded for malicious prosecution); *First Nat. Bank* v. *Fidelity & Deposit Co.* (1978) 283 Md. 228, 241 [389 A.2d 359, 366] ("We suspect that . . . the common sense of the entire community would not construe . . . insurance contracts [covering compensatory and punitive damages awarded for malicious prosecution] to be against public policy. In fact, we strongly suspect that the common sense of the community as a whole would expect a judgment including exemplary damages to be satisfied through the insurance policies for which small business people had paid").

[41]We recognize that the Downey plaintiffs dismissed their fraud cause of action. However, they did so *without* prejudice for apparently tactical reasons and the parties have discussed the issue in their briefs. We have therefore, in the interest of judicial economy, addressed and disposed of the issue.

of a punitive damage award. The Downey plaintiffs, in making a demand for and ultimately agreeing to such settlement, were at all times aware that LMI had fully reserved its rights to recoup both settlement and defense costs.[42] Under such circumstances, California law clearly supports an insurer's right to reserve and enforce recoupment of sums advanced to procure a settlement and thus end the litigation and the liability exposure of the insured. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744]; *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 587-588 [126 Cal.Rptr. 267].)

The trial court's order which seeks to reduce or impair LMI's right to such reimbursement by the amount of defense costs "saved" by LMI as the result of the settlement and thus the termination of its defense obligation is simply without legal authority or basis. As the Supreme Court pointed out in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35, 46, an insurer's duty to defend is discharged when the action against the insured is concluded. Once the duty to defend is extinguished, the insurer "does not have a duty to defend further." (*Ibid.*) If its reimbursement right can be reduced by an amount equal to the "estimated" defense costs which it did not have to incur, LMI would be required, in effect, to pay additional defense expenses after its duty had been discharged. Moreover, the financial benefit resulting to the Downey plaintiffs would effectively provide some degree of indemnification to them and would thus violate the indemnity proscription set out in section 533.

## CONCLUSION

We conclude that section 533 precludes indemnification to any insured who is found personally (as opposed to vicariously) liable for a malicious prosecution claim arising from conduct which is prosecuted under the law of California. However, section 533 does not preclude a defense for such a claim and LMI, having promised to do so, was obligated to provide a complete defense to the Downey plaintiffs for both the O'Grady and the Watson actions. LMI discharged that obligation and because it was not required to indemnify the Downey plaintiffs, it is entitled to fully recoup *all* funds advanced to effect a settlement of those two actions. LMI is not estopped to assert section 533 as a bar to indemnification and cannot be liable to the Downey plaintiffs in promissory fraud for doing so.

---

[42]LMI, however, never made any demand for a recovery of defense costs and does not seek them here. Given that LMI, as we have found, owed a defense obligation, it could not recover such costs in any event. (*Buss* v. *Superior Court, supra,* 16 Cal.4th at pp. 49-53.)

## DISPOSITION

The summary judgment granted to LMI on the complaint of the Downey plaintiffs is affirmed. The court's order denying LMI's summary judgment on its cross-complaint is reversed and the matter is remanded to the trial court with directions to enter judgment in favor of LMI for the total amount it contributed to the settlement of the O'Grady and Watson actions, together with interest thereon as provided by law. LMI shall recover its costs on appeal.

Aldrich, J., concurred. Klein, P. J., concurred in the judgment.

A petition for a rehearing was denied September 17, 1998, and the petition of plaintiffs and appellants for review by the Supreme Court was denied December 2, 1998.